Case No. 22-1019, Eddowes, Eagle County, Colorado v. Sturface Transportation Board, United States of America Ms. Hunt v. Eagle County, Colorado Ms. Sparks v. Denver for Biological Diversity, Eddowes Ms. Millers v. Sturface Transportation Board Mr. Heminger v. Division Wildlife Services Mr. Johnson v. Intervenors Mr. Heminger v. Intervenors, Eagle County, Colorado v. Eddowes Mr. Heminger v. Intervenors, Eagle County, Colorado v. Eddowes Good morning, your honors. On behalf of Petitioner Eagle County, Colorado, I'm Nate Hunt. 350,000 barrels of crude oil will be transported in 18 miles of trains each day across Colorado and the West under the Uinta Basin Railway Project. To put that in perspective, 350,000 barrels a day equals 14.7 million gallons of oil that will be transferred every day of the year under the project. In approving the project, the Surface Transportation Board failed to evaluate the down-lying environmental impacts caused by that rail traffic and the cargo it carries. Most notably, the Board failed to evaluate the impacts to water resources along the existing Union Pacific Line, including the Colorado River, which runs right next to the Union Pacific Line for over 200 miles of the down-lying segment. Substantial evidence in the record demanded that the Board take a hard look at the impacts to the Colorado River, other water resources down-lying, as well as biological resources. The Board's own Office of Environmental Analysis determined that under the railway, it will double the accidents on the existing Union Pacific Line. And if the project moves forward, the railway will cause three times more accidents on the Union Pacific Line than on the proposed Utah Line in the Utah study area. And yet the Board limited its analysis to water resources to only the new proposed line in the Utah study area. That was arbitrary, particularly when the Board and the Office of Environmental Analysis was on notice that there could be potential significant impacts to the Colorado River and other down-lying resources. Colorado's Department of Public Health and the Environment, the state's top environmental agency, warned the Board, you need to take a hard look at the environmental impacts of this rail traffic on the Colorado River because of its sensitivity, because of its ecosystem, because the state and the West relies on the tourism and recreation on the Colorado River. I'd like you to address jurisdiction, particularly whether your client is a party aggrieved under the Hobbs Act. I get the aggrieved part, but are you a party within the statutory definition of that term as interpreted by our precedent? And I guess I'll just cut to the chase. I think it's the Board's brief at page 76 points out that the county did not submit a reply to the exemption petition. The center did, but the county did not. And given that, should we conclude that the county is not a party aggrieved because it didn't engage as a party in the exemption proceeding? The party engaged in filing a petition for reconsideration of the Board's initial preliminary decision. So it did participate as a party when it filed a petition for reconsideration. But along those lines, I'm not aware of a decision that this Court has addressed this, but the Alaska Survival Ninth Circuit case said that a party does not need to participate necessarily in the proceedings for an exemption under the Act simply because of the informal nature of an exemption proceeding. And another related point is that the Board, at Joint Appendix page 4 in its preliminary decision, and Joint Appendix page 26, the Board acknowledged Eagle County as a party implicitly by stating that all comments submitted on the exemption proceeding, as well as on the final EIS and draft EIS under NEPA, those are all compiled and considered as part of the Board's record. You participated in the EIS process? Absolutely. Can I ask you, you argue in your brief about the standard for the preliminary exemption or conditional exemption decision wasn't met. I'm having trouble understanding, at this point where we are now, why that matters, because we have a final exemption decision, which would sort of carry with it everything, seeing that it went before, and it's not even clear to me what you get from a conditional exemption. They can't start building anything, so I'm just not sure what the harm is from the conditional exemption that you're trying to remedy. And if not, then why are we, why do we need to decide whether they appropriately issued a conditional exemption since everything got, you can talk about the merits of whether they appropriately reconsidered things or analyzed things properly at that stage, but what does it matter? It matters in terms of the preliminary decision was incorporated in the final decision. The reason why the Surface Transportation Board instituted a policy in 2007 in the Alaska Railroad case is because it was trying to prevent putting the thumb on the transportation merits. In other words, pre-judging the merits of a project. This is precisely the reason why that policy was enacted, because you don't, the board was prevented from conducting a transportation policy analysis based on the entire record. It was prevented, or just maybe? The board did not, the board failed. That's a different argument, but that's when you make about the final exemption decision. You can say they did or didn't do a good enough job, but. Well, it goes to the merits of the final decision. I mean, even if they hadn't done the conditional exemption, plenty of people will look at an exemption decision and go, and people will disagree. Well, they're going to say you didn't analyze X or Y well enough, and nothing about that conditional exemption affects your ability to argue after the board made that final exemption decision that you didn't analyze this as the law required. And whether they did it because they'd done a preliminary one, or they just didn't do the job right, or. To be clear, we're challenging the final decision. Right. It just incorporated the preliminary decision. And in the final decision, the board said, the board did not revisit the transportation merit policies, did not revisit the merits of those, and did not compare those policies with the environmental relevant policies in an even, balanced way. And that led to, that's one of the flaws in the final decision. And that's, that was the reason why the board enacted the policy against conditionally granting approval. Because the risk of plowing the final decision outweigh any benefits of conditionally granting approval to a project that cannot proceed without a final decision. She's asked it this way. If we were to decide you were right, that they had improperly done a conditional exemption, but you were wrong about the merits of their final exemption decision, just assume for these purposes of this question. We thought they had done the right transportation merits analysis and the right balancing. Is there any relief we could afford for them having done, at this stage, for them having done the conditional exemption? No. We've raised that issue because under the Administrative Procedure Act, when an agency goes against its policy, its practices, it needs to provide an adequate explanation. That's just one of the, and so we've raised that issue. You just said there's no remedy we could give for an improper conditional exemption at this point. Right, but you could still consider it as an arbitrary measure as part of the overall final decision. So, the interrelationship between NEPA claims, ESA claims, and the Rail Act claims is a little bit unclear to me. So, you argue that the NEPA analysis was inadequate for failure to consider the water effects and the fish effects along the Colorado River downstream of the project, right? Correct. And I take it you've also argued that the deferral of considerations of geological hazards violates NEPA. Is that right? Yes, that's a co-petitioner's argument. Okay. But I also take you to be, see, there are various things like the greenhouse gas emissions, which were identified in the environmental analysis, but then not weighed in the rail policy. So, is the claim that even if something's adequately surfaced in the NEPA analysis, that the fact that it may be adequate for NEPA purposes doesn't mean that it's been adequately considered in the decision under review? Is that part of the nature of your claim? Yes, exactly. There are two different statutes with two different processes. NEPA is a procedural statute. Here, the board found significant impacts, significant impacts to water resources and other things. It's our position that they didn't meet the standards for NEPA, but that is a separate decision in the substantive analysis that's required by the Interstate Commerce Commission Termination Act, which is that you must, that the board must conduct a substantive analysis of the relevant rail policies. And, as part of that analysis, weighing the transportation merits versus the environmental harms. But there's this whole argument about cumulative versus indirect effects, and the respondents say, you know, they were considered, they were considered in the same way. It's not entirely clear to me what the argument is about the impropriety of cumulative. I take it that one way of understanding what they did was they said, yeah, we're recognizing these other effects, but only as raising the baseline against which project effects are then evaluated as an additional increment. That would be a very different consideration, but they're also talking about the effects as effects of the project. And so, could you just help me understand what's at stake and where it's reflected in the record that they underweighed the effects, for example, climate effects, by treating them as cumulative rather than indirect? I will, to the extent I acknowledge that would be, that's a claim that co-petitioners are, I'm sure, going to want to address. But you also raised that claim. No, we have not. But I'm happy to discuss it. I'm sorry, I'll ask co-petitioners. That our claims have to do with indirect effects, not how they're categorized. And not also the improper characterization of effects. Correct, correct. Our claims focus on water resources. They focus on biological resources. They focus on downline impacts for land use and recreation. And so, our claims do not touch upon the distinction between indirect and cumulative impacts. Focusing on the Interstate Commerce Commission, on the RAIL Act, the policies that you say that they didn't consider, you're focusing on health and safety? We, there's, they based the decision on eight, or I'm sorry, six RAIL policy factors. Our position is that their analysis of RAIL policy factor dealing with enhancement of competition, the RAIL policy dealing with the improvement of, or enhancement of economic conditions in RAIL. Were woefully inadequate. The two environmental related RAIL policy issues that we have claimed they did not adequately consider. Especially in the context of all the RAIL policies. Are the public health and safety RAIL policy. And worker safety. And the board takes a very broad approach to those. Here, the board considered the environmental effects downline, such as wildfires and RAIL safety under those. But those are the two environmental related RAIL policies that the board did not address in its preliminary decision. It planned those to go on the final decision. And how are they inadequately assessed in the final decision? Which ones are you, are you? You just mentioned wildfires. You mentioned two. Yes. Wildfires and accidents. Yeah, I'd also like to address the first two as well. Address them all? Yes. Well, I'll address the first one, which is enhancement of competition in RAIL. Between conventional RAIL and other modes of transportation. Board found in the preliminary decision, this is going to enhance competition in the region. Page 27 of the Joint Appendix, final decision, the board goes so far as to say nothing in the environmental record makes us question our determination in the initial decision that competition is going to be enhanced. Well, that's flat out rejected by the Office of Environmental Analysis conclusions on what was going to occur if the project is approved. The Uinta Basin is capped at 90,000 barrels of oil right now. Refineries in Salt Lake City cannot handle any more of the oil. They need another way to be able to get the oil out of the basin. Overall trucking, if this project is approved, overall trucking is not going to change. So there's no competition between RAIL, as the board found and as the coalition argues, there's no competition that's going to be stimulated by this project. Wouldn't there be price competition? No. Yeah, exactly. I mean, the board doesn't go into detail on what really the details about competition say. I read the record that way, too, where they're saying the workers that are in trucking, the capacity in trucking is apart from and would remain, you know, and then the capacity that would be facilitated by the RAIL is over and above that. But you're saying that we can't reasonably understand their reference to competition to be kind of price competition, that people will no longer be using those trucks if they could deal more cheaply over the RAIL? Exactly. And I'm not just saying that. The Office of Environmental Analysis said overall trucking is not going to be reduced. That's jointly dependent. Amount of trucking, but would the price for it go down? The board did not dive into those details. Details that you would think that you would dive into that are related to what competition has. Isn't it self-evident if suddenly the well owners have a choice about which way to transport, that prices will – right now you have a monopoly on transportation. I don't mean it in any pejorative sense against the owners of the trucks, but just a sort of world reality monopoly because there's just the road in and out. And now the point is – I think the board's point is that now there will be two ways in and out with two different resources to be used for transportation, which just inherently increases choice that increases competition. That hits precisely the flaw in the competition assumption that the board made. The Office of Environmental Analysis determined that only 10,000 barrels that are currently being trucked out of the basin are going to be displaced by the RAIL. They're going to go to the RAIL. That's 10,000 out of 90,000 barrels. So when you think about that, it's projected that 350,000 barrels of oil will be transported across the Rocky Mountains. 10,000 of that is going to be oil that is now being trucked. So that's the competition. It's 3% of what – Trucks can only do 90,000 and there's going to be 350,000 and the train is doing 140,000. Is that right? Low oil production is predicted at 130,000 barrels a day. High oil production is predicted at 350,000 barrels a day. Did you want to talk some about the wildfire risk and the accident risks as well? I thought you said those were two of your arguments as well. You had four, competition, wildfire, accidents, and what was the fourth? There's a RAIL policy that the board needs to determine whether the project is going to promote sound economic conditions in RAIL. And your position on that? It's baseless. I mean, there's nothing in the record that suggests that this is going to enhance sound economic conditions. There's nothing in the record that they can make a decision on. It's hard to tell in the context of this case what that even means. I mean, they say no need to examine the financing or not because that's something the market will take care of. Even though Utah says this is not a market project, this is a public infrastructure development project. So presumably the taxpayers are going to pay for it. So what is the theory, as far as you can glean having been involved with this longer than we have, what promoting sound economic conditions for RAIL even means in this context? To be honest, I don't know. I mean, that's one of the flaws in this decision-making process. We heard sound bites. We never heard factual evidence. What we do know is that the one piece of factual information that goes to whether this is financially feasible or viable is the consultant study in 2018, RAIL Bank, which evaluated the feasibility of this project. Now, that was not submitted to the board by the applicant. That was submitted to the board by a co-petitioner and is heavily redacted. What about, I mean, Alaska Survival, which I recognize is not finding precedent in this court, seems to say, no, whether it's a good idea, whether it's going to be too expensive or the like, it's just, it's not, that's not part of the Service Transportation Board's decision-making. That's for the policymakers in the market and whoever is going to be on the hook. Why shouldn't we, even though it's not binding, follow that same approach here? That is the default position of the board, that we're going to leave it to the market, right? Or the state policymakers. Right, but whereas here, where there is significant questions about the financial feasibility of the project, which were raised by many, many commenters, where there is a significant public interest, where there are going to be landowners who are going to have their homes condemned or who are going to be affected by the actual construction of the railway in Utah. You don't represent any of those. They're not before this court. I'm sorry? You don't represent any of the people in Utah. No, no, I'm going over rationale that the board has provided in the Texas Railroad case. Where it justified going away from the default rule that the market, we'll let the market handle it. Where there's significant public opposition, where there's significant questions about the financial feasibility, the board in Texas Railway said, no, there's too many questions. Those questions should be answered in a formal application process. Where the board is required, and Chairman Overman, who dissented, really explains this at page 12 of the joint opinion, the board is required to consider the financial viability of the project. The public need for the project and the public interest. And the reason that the board took that position in Texas Railroad, which we've explained in our brief, is that the board doesn't want to authorize a speculative project, have it be constructive, and have significant environmental impacts, only to have a railway that's not used. Because it's not profitable or because demand is not there. And as Chairman Overman in his dissent, in both dissents, highlighted, the applicant, the coalition's own consultant, found, concluded, that they don't know how much oil reserves are in the basin, in the Tooe Basin, and they don't know what the demand is for this particular type of oil, waxy crude oil. So that right there demonstrates speculative nature. I think your clients would be nothing but happy if the railway didn't operate, because then it wouldn't be coming into Colorado. This seems like an argument I would expect someone from Utah to be making, but no one is here. As far as your interests are concerned, if they build something and it never leaves the station, that's good for your clients. That's a public interest factor. I mean, that's a public interest. It's not Colorado public interest. No, I think it's safe to say that the general public doesn't want the federal government to authorize billion-dollar projects that have tremendous environmental impacts. But those impacts are all going to be in Utah, am I correct? Yeah, that's not... I mean, you and your clients wouldn't have standing to... I mean, the general public might very well care about this, but you wouldn't have standing to argue about those environmental impacts or the consequences of, you know... Right, right, and I'm not... that's not one of our arguments. I'm trying to demonstrate the board's reasoning to deviate from its default policy of relying on market factors. And our argument here is that Texas Railroad is very relevant, and the board should, given the record before the board, the board should require a full application process. Is the financial concern just construction or also operation, which then could affect the safety factors coming into Colorado? That's not on the record, but I can tell you, as we're all aware, like operations, you know, if you don't have... if a company doesn't have sufficient resources to operate anytime, then there's more likelihood of shortfalls. I mean, there's this issue in the case with respect to your client's interest about the capacity of the project and the SCB in approving this project to include any mitigation downline. Their jurisdictions over the project itself, they say, you know, we couldn't include mitigation downline. If there's some other transaction or regulatory action that would... I mean, I'm assuming if I'm the owner of the Union Pacific line, before I allow, you know, nine or ten hundred car long oil trains to go on my track, I would charge them for track upgrades, for the wear and tear. Is there anything else that I'm unaware of that would be a mechanism if the board is correct that there's no ability to attach downline mitigation in this case? That's outside of the record. It's not really addressed. I think a railway operator could make those types of requirements. I think that the point of the mitigation factor is that the board only required mitigation of the proposed railway. And in evaluating the weighing the harms of the project versus the transportation merits, the board repeatedly said these are significant, but our mitigation measures are going to address that. And this flaw in that is that any of the downline environmental impacts are not being mitigated. And, you know, this is not an argument that was made in comments, but I'm not aware of why, and this is a question for the board, why the board can't engage in some mitigation measures downline. For example, the board relies heavily on emergency response mitigation measures to address wildfires. There's nothing, I'm not aware of anything, of any law under the ICCTA or any other relevant laws here that prevent the board from saying this is going to at least determine that this is going to have significant environmental impacts downline, including wildfires in Colorado. You're required to coordinate with Eagle County and the other affected communities down the line to make sure that they have sufficient emergency response measures for wildfires or for oil spills. Nothing prevents the board from doing that. Sorry, they're supposed to ask you to have more emergency response measures, or some county says, no, we don't have the budget. Have you noticed it's a tough economy and it's also hard to hire people? We have no budget to increase our emergency response. Then what happens? Under any environmental law, NEPA, Clean Water Act, there is wide discretion in what you require for mitigation measures. And that's including... I'd like to follow up more concretely on whether they're right, that there's really nothing they can do about downline mitigation because it's an existing rail line, and some of the mitigation is going to involve governmental entities that it has no authority to impose orders onto, does it? I mean, could it order you to increase your... Could the board order Eagle County to increase its emergency response? Not that I'm aware of, but it could order the railway applicant to provide funding for mitigation measures. But again, we're... To fund Eagle County's fire response? Yes. They can do that? I'm not aware of anything that prevents them, but this is... We're getting away from... No, we're not getting away. I'm really trying to understand. You objected to their argument about their ability to mitigate downline. I'm really trying to understand. It's a private entity. That's not one of our claims. We're not saying that you failed to mitigate downline. We're saying that when you evaluated the environmental harms of this project, you relied heavily on the 150 or so measures, the mitigation measures that the board is requiring. Board, none of those measures pertain to downline environmental impacts. And that is a significant flaw in your environmental analysis. So your argument... I know, but that argument sounds to me like you should have addressed mitigation efforts downline. That's one argument. If what you're trying to tell me is your argument instead is you can't mitigate downline, and so you should have taken that harm into a more urgent account when you were making your decision. It's the latter. The board did not consider the fact that none of the mitigation measures, which they relied on so heavily to address the significant environmental impacts of the project, none of those are going to pertain to significant environmental impacts of downline. Can you ask me one practical question? Again, I wasn't clear from the briefing. What is the difference between going through the exemption process and the 10901 formal process? You said, well, they would consider financial liability, but is it... How is it different? How are they two different? What else would come into the record through a 10901 process? Or what would the board do differently through a 10901? I don't have the regulations before me, but they require just a lot more detailed information on the economics of the project, including... That's the only difference? Yes, and also it requires a public notice. But also the standard that the board is required... The board cannot set the financial feasibility aside. It's required to consider that. The board is also required to consider the public need and the demand for the project, as well as the public interest. Those are requirements that the board must consider in the application process. If it says we did public need and public interest, you may object to it, but we did that in this decision, and the only delta between the 10901 and the exemption process is sort of a better, more thorough analysis of financial liability. Does one take longer? Do they take the same amount of time? I apologize. Do they take the same amount of time, the 10901 process? Not aware of the timeline. Any other questions? So just to be clear about the scope of your claim, as in contradictions of your fellow petitioners, you're challenging the failure to consider wildfires and accident likelihood and with respect to the accidents also affect on water. Yes. Yes, and the consideration as such of competition and sound economic conditions for rail. Those are basically the four points that you wanted to highlight. Correct, and the other rail policies, public health and safety, that are environmentally related. And that's where you get the wildfires and accidents. Yes, and the board failed to conduct an adequate or even analysis of those considerations. So climate is not an issue that you're pressing? Climate is definitely an issue. I thought it was, but I haven't heard you say that. Eagle County is not. That's not one of our claims.  There is one other rail policy, though, that's related to climate, and that is the board's failure to consider the rail policy of promoting energy conservation. That wasn't raised before the board, was it? It was raised before the board. It was. By you? By Eagle County, yes, in our comments on the draft EIS. And the board has argued that somehow the timing of our comments precludes Eagle County from making that claim. That lacks merit. The board, again, on joint appendix, page 1226, in its final decision said... 1226? No, 12226. Just 26, page 26 of the joint appendix. The board says all comments, all comments on the preliminary decision, on the final EIS, they're all incorporated. They're all part of our record. And where should we look for your energy efficiency comment? It's in our comments on the draft environmental impact statement. And that is, I don't have the precise, it's around 740 of the joint appendix. All right, thank you very much. Thank you. Good morning, your honors. May it please the court, I'm Wendy Park representing Petitioner Conservation Group in our challenge to the board's authorization of the Uinta Basin Railway. This 88-mile-long railway will cut across the Uinta Basin's rugged and mountainous terrain, sending thousands of oil trains to the national rail network annually. Those two-mile-long oil trains will haul billions of tons of oil annually along the Colorado River on their way to Gulf Coast refineries. And with this new railway, Uinta Basin drillers will ship, drill, and sell more oil by more than 350,000 barrels per day. And so I'd like to address in my argument today two issues. One would be the indirect effects of the project, the board's failure to consider in the EIS the upstream and downstream oil production harms as indirect effects of the project, and why this was prejudicial error going to Judge Piller's question regarding both under NEPA and under the ICCTA. And I'd like to also address the biological opinion's failure to consider the effects of oil spills and leaks on the four Colorado River endangered fish. So turning first to our claim regarding the indirect effects of the project, first I'll just provide a little bit of context on what this project is about to eventually get to Judge Piller's question from earlier. The singular driving purpose of this railway is to ramp up oil production in the Uinta Basin. And the EIS's total failure to acknowledge that driving purpose, the intended effect of this project, was a fundamental flaw in the NEPA analysis. So as Mr. Hunt alluded to in his argument, this project is about opening up access to the national rail network so that oil drillers can move out of the basin hundreds of thousands of barrels of oil per day. And it's only with that access that these drillers will be able to ship oil in massive quantities to the national or to other refineries outside the state. And in fact, the only product that will be shipped on the line is oil and fracking sand, which is required to expand oil production in the basin. And isn't there some tiny little, on those same trains there might be a car with some merchandise or agricultural... The EIS does allude to possibly that happening in the future, but there are no foreseeable plans to ship any other goods along the line except for oil and fracking sand. So it's all oil-related shipping. Is this oil removed through fracking? I'm sorry? Is this oil removed from the winter basin through fracking? Yes. That's what the fracking sand is for. Yes. So every barrel... The EIS actually acknowledged that every barrel of oil that's shipped on the line, again up to 350,000 barrels per day, would come from entirely new oil production. And that would mean that Uinta Basin oil production would have to increase by almost five times current levels for those volumes to be shipped. But the problem is that the EIS failed to connect the dots and disclosed that the railway would induce this quintupling of oil production and cause serious environmental consequences for upstream communities in the Uinta Basin and downstream communities in the Gulf Coast. So, for example, the EIS failed to disclose that this project will spur the drilling of thousands of new oil wells and, as a result, worsen oil pollution in the already smog-choked Uinta Basin and destroy and degrade habitat for sensitive, rare desert plants. It failed to disclose that it will unleash more than 56 million tons of greenhouse gas emissions from both upstream drilling and downstream refining and combustion of oil on the line, or nearly 1% of U.S. emissions. Doesn't it disclose that? I mean, it's in the record. And so what I... I mean, I'm trying to understand that NEPA is a procedural statute. It requires acknowledgement of various effects. I thought the figures that you're referring to about the low or the high estimates are actually figures that came out through the environmental analysis. Is that wrong? No, that's not wrong. Those figures did come out through the environmental analysis. But the problem is that those increased emissions, those thousands of new oil wells were attributed as effects of oil drilling projects and not as effects of the railway. And that's... It's identified. Does the attribution matter only for purposes of the Rail Act or also for purposes of NEPA? Because they're basically saying, you know, these are things that are going to be approximately caused by this expansion of... by making the line, the Uinta Basin, connect to the Pacific Line and be able to bring this oil to the coast. I absolutely disagree that the EIS says that these oil production harms are approximately caused by the railway. There is nowhere in the EIS that they admit to these effects being caused by the railway. And to get to the other part of your question, Judge Pillard, it matters for purposes of NEPA, not just for purposes of the ICC Termination Act. The whole point of NEPA is to inform decision makers and the public of the environmental consequences of the proposed action. But by masking oil production harms as the effects of other projects in the board's cumulative impact analysis, the board obscured the railway's causal role in creating those effects. And that is contrary to NEPA's demand for forthright disclosure and analysis. If they failed, we would reach the same decision, even treating them as indirect effects. So they sort of processed it both ways. So they told the public, even if these are indirect effects that is caused by the railway, our outcome is the same. So what do we do with that? Your Honor, I disagree that they said that they would reach the same decision. So they assert that post hoc in their briefing, that they would have reached the same decision. It's a post hoc rationalization and it has absolutely no support in their decision or in the record. And so it's SIP Note 15 of the decision, which is that JA40 that I think you're referring to. It says, furthermore, regardless of whether the EIS labeled the impact from oil and gas development in the basin as indirect or cumulative impacts, OEA conducted a full analysis of those effects. The impact from the analysis of those impacts would be the same, no matter which label is used. And so that does not say that the decision would have been the same. What that says is that their NEPA analysis would have been the same, regardless of this so-called, what they call a mislabeling error. But if the impacts are the same, on what basis do we think it would change the ICCTA decision? How can we do that if we say the impacts are the same? It's all analyzed and the impacts are the same. How can we possibly think that it would make a difference under either one? Well, so the reason why it makes a difference is for purposes of the weighing analysis, which entirely, the weighing analysis between the transportation benefits and the environmental harm of the project, the board entirely relies on the EIS for its accounting of harm. Is there another EIS process required, for example, if new wells are authorized in the basin? There possibly could be for new federal oil wells, but the point under stable trail, it doesn't matter, because here the board has the ability to deny the project on the grounds that the project was too harmful for the environment. And so all of those new oil wells, it doesn't matter if there are other approvals that are further down the line, because the board has the ability to deny the project on the basis that all of those new oil wells could be too harmful for the environment, then it had to consider the effects of those oil wells in its indirect effects analysis. It couldn't simply ignore them. And I think that the problem that's at issue here is that, you know, on the one hand the board says that they didn't consider, they couldn't consider these effects because it wouldn't be useful to their decision making, because under public citizen, they wouldn't have the authority to do anything about these oil production harms. So that's what they say on the one hand. But then on the other hand, they say, well, actually we did consider them in our cumulative impact analysis, but then how could they have actually considered them in their final weighing analysis between the environmental harms versus the transportation benefits if they said in the first place that they were not allowed to consider them. So those effects were never weighed as harms of the project. I do have a little trouble figuring out what people are referring to as cumulative. Is it your understanding that they're saying, well, we're assuming that those things would happen as a result of separate and independent decisions of oil companies, let's say, and we are analyzing the effect of this rail construction and the use of this line against that higher baseline. Is that the analysis that you understand them to be referring to when they refer to a correctly cumulative approach? I mean, I thought cumulative would be, okay, you add the, let's say, the greenhouse gas effects of the actual construction of this line and the running of the train on the line. And then you add on top of that other effects, the running of the trains along, the running of refineries and the ultimate combustion of the fuel, and those things all accumulate to make a big effect. And whether you treat that as cumulative or indirect doesn't matter as long as you see it all as flowing from the project. That's one way of understanding it, which seems to support the notion, why does it matter, we looked at it. But I'm trying to understand what the different treatment is that you're accusing them of having engaged in that doesn't fully count. Well, because in a cumulative impact analysis, the reason why the board is considering the effects of other projects is not to assess the significance of those other projects. It's not to assess the significance of the effects of other projects. It's to assess the significance of the agency's action effects in context with all of the other types of stressors or burdens that could be acting on the same resource. So the point is for the board to have, or the agency to have, a realistic picture of the environmental impacts of the project and not just simply look at them in a vacuum. So packed into that label, cumulative, in your view, is that they're saying those are not effects caused by this project. They're just part of the context that this project comes to. Where do they say, and therefore those effects will not be factored into our weighing analysis under the ICC? Why do they say that? Well, they say that they couldn't consider them because it wouldn't have been helpful to their decision making because they didn't have the authority to prevent those effects. That would be true either way, whether they call it indirect or not. There's this category of effects. There's nothing we can do about it. We can't mitigate. But what they're essentially saying is that they didn't have to consider them. Where do they say that? Do you have a JSA site where they said that? Well, I mean, they're essentially arguing it. Okay, so I would point the court to, I believe it's in the EIS, the final EIS, and JA-1238. And in the middle of that paragraph, the first full paragraph, Okay, well, excuse me. Going further up, actually, that's the first paragraph at the top of the page. So they say that the coalition's proposed rail line is not an approximate cause of oil and gas development in the basin because such development may occur and is already taking place without the proposed rail line. You're just talking here about NEPA. I was asking you, and if I misunderstood your answer to Judge Pillard, tell me, I understand your argument to be the reason proper characterization under NEPA matters is not so much for NEPA. They've laid everything out. That's really what NEPA's about. It matters because then when they get to weighing transportation merits against environmental harms under the ICCTA, that's when they discount cumulative effects from that weigh-in. I thought that's what you said. Did I misunderstand you? Well, for purposes of NEPA, I don't believe that they fully disclose the harms as the project's effects. They only disclose those oil production harms as the effects of other projects. Why does that matter for NEPA? As long as it's fully disclosed to the public. If they've got the label wrong, that they disclose the relevant environmental information and consequences to the public. It matters for purposes of NEPA because, first of all, they've significantly under-estimated the project's effects. Okay, but that's just a separate objection. They just didn't do the analysis right. That's a separate objection. It doesn't apply to how they characterize it. Oh, I believe it does because if they're saying that they don't have to consider all of the truck trips from all of the traffic generated by the railways between the oil fields and the rail terminals, then they're not counting those truck trips as having been generated by the project. They're counting them as truck trips that were generated by oil and gas drilling. And so they're not being forthright about the amount of traffic that this project could generate. And they're under-estimating the total impact. Yes, they did acknowledge it in their cumulative impacts analysis. But that's a separate... The cumulative impacts analysis... Okay, but does the cumulative impacts analysis affect the weighing under the... The subsequent weighing... When you do the EIS, that's one thing. And then they're supposed to take these environmental consequences and go weigh them against transportation merits. That's what they're supposed to do in their final decision. Does whether they called it in the EIS, cumulative or indirect, have any effect down when they get to that balancing on how they do the balancing? That's what I thought you were talking about. Yes, I'm sorry that I didn't directly answer that before. So, I mean, one thing that they say in their briefing is that they could not have considered oil production harms as a factor to weigh against the approval of the project because their duty to enforce the common carrier obligation... Right, that's their briefing. But what did the board say? We don't review briefs. We review the board's decision. So what did the board say? We're therefore not including that in our weighing analysis. Well, so I believe it's implicit in the decision because the decision entirely relies on the EIS for the accounting of harms and the harms of the project. And the harms of the project are only the indirect effects of the project. They can't be the harms of other projects. But they said even if we treat them as indirect effects, this is what the board now said, our decision is the same even treating them as indirect effects. Well, so if that's the case, if that's what they said, we don't agree that they actually said that they would have made the same decision, but if that's how the court would interpret that, there's absolutely no reasoning supplied as to why they would have reached the same decision, as to how they would have gotten to that place because they don't actually weigh the impacts of oil and gas development in addition to the impacts of the construction and the operations of the railway. So how do they even justify that? That's totally absent from the record. So do you have a position on whether we have a jurisdiction to review or what the nature is of our review of the financing or not of the project? Honestly, it's not something that we focused on in our briefing, but I would agree with Eagle County's counsel that under Alaska Survival, for informal proceedings, it's good enough for Eagle County petitioners to weigh in at the draft EIS stage to object to the financial feasibility of the project. Those issues were raised by us and by the conservation groups in our reply on the petition. So on the substance of the environmental issues, did you want to just briefly emphasize the errors that you think are principal problems? Sure. The fish, is it the fish principally? Yeah, there's the fish. But I guess one other thing I'd just like to address before we head to that claim is that the reason why this was also prejudicial under NEPA, this mislabeling error was prejudicial under NEPA, is because the board lost an opportunity to consider mitigation for indirect effects of the project or for the oil production harms by considering them the effects of other projects instead of this project. Can you be more concrete? Sure. So with respect, again, to the massive increase in truck traffic that would arise due to the additional drilling generated by the railway, the board could have considered mitigation like requiring the seven-county coalition to... You mean the massive increase in rail traffic? You said truck traffic. No, I'm talking about truck traffic that results from the massive increase in oil production, the trucks that would go between the oil fields and the rail terminals to bring oil over to the railway. All of that they considered as the effects of other projects instead of this project. And so they did not consider any mitigation for that truck traffic, even though without this project there wouldn't be any truck traffic going between the railway and the oil fields. Because there would be no induced additional oil production.  And is there... I think I just asked Mr. Hunt. Do you know if there's a separate permitting required for creating new oil wells? Yes, there would be state permits required for oil wells. But again... And a NEPA analysis for now? If it were a federal project, perhaps, but not for a project on state or federal land. But again, going back to Stable Trail, it doesn't matter that there are other approvals down the line because the board is required to consider all indirect effects of the project based on its duty to consider the public health and safety under the rail transportation policy because it could deny the project on the grounds that the project would be too harmful for the environment. So if it has the... You keep saying cumulative effects is not part of this project, but the whole point of NEPA is that cumulative effects are a consequence of a project. That's why you have to discuss them in analyzing the environmental consequences of the project. So is there something in NEPA regulation case law that says the action agency is unable to do anything to mitigate cumulative impacts triggered or contributed to by the project? I don't believe that they're not able to do anything about the incremental impact of the action. I mean, that's really the focus of the cumulative impacts analysis, is the incremental impact of the action. Right, there's going to be more trucks. It's going to be incrementally more trucks. And so there's nothing they can do to mitigate that? That seemed to be your argument, that they can't mitigate it because they're not calling it an indirect effect. They can't mitigate for... If they're considering the effects of the effects of other projects, then... Cumulative effects are effects of this project added on top of other things going on. That's what cumulative effects are, right? You're adding things that it's on top of. Maybe it's not by itself, but when mixed together with other things, like decisions about developing oil wells, then this is going to... It's the two coming together. The oil well decision is going to create more oil, and our decision about the rail line is going together. Those are going to create a need for trucks to take the oil from the well to the train. And so it is not as though that has nothing to do with this project when it's a cumulative effect. NEPA says that counts as a type of effect of this project. So, and I understood your argument, and tell me if I'm wrong. I can very well be misunderstanding this. The problem is when it's called a cumulative effect, they can't mitigate. For example, they couldn't mitigate, do something to mitigate the truck traffic or truck pollution between the wells and the railroad. Right, they didn't consider any mitigation. They didn't consider. It's a different argument. That may be a substantive attack on their consideration, but they could have considered mitigation effects for those cumulative effects as well, correct? I suppose there could be a way that they... I mean, I think the point is that mitigation goes to the effects caused by the project. Well, you have to know, there's a separate variable, which is even if you accept that the additional trains on the Pacific line would be caused by the project, they're saying, you know, that's in another state. We don't have control over, you know, anything from fire response to maintenance on the tracks to speed that the trains travel. It's just beyond our bailiwick. So, whether it's indirect or cumulative or otherwise. And that seems like that's independent objection. It may be bolstered slightly by considering it cumulative because cumulative seems to distance, you know, conceptually distance those effects. But it seems like it's a distinct objection that they're raising. But we can also ask them about authority to mitigate. Maybe they could do more to mitigate the trucking because it's right there in Utah. It's right there in the county. It's right at the project rail line. Great. Yeah, I mean, I think that the problem here, though, is that because they essentially said that they had no control over these effects, that they didn't have a duty to consider them as the effects of this project. And then they not only didn't consider mitigation for those effects, but they also didn't weigh them in their weighing analysis of the harms versus the transportation benefits. And that's the problem here is that their whole decision boils down to are the harms of the project, are those heftier than the transportation merit? And if they considered oil and gas harms, not the incremental impact of the project on top of oil and gas harms, but just the oil and gas harms as the effects of other projects, how could they have considered those as effects of the project or in their weighing analysis? It just doesn't make sense. And so, Judge, I just want to make sure that have I ‑‑ I think so, but can I ask you something very separate? Do you know, and this goes to the environmental justice community's argument, I never knew there was such a thing as waxy crude oil until this case, to be clear. So is there something in the record that talks about does the refining of waxy crude oil, is it done a different way, involve different chemicals or discharges than non‑waxy crude oil, or is the environmental justice concern simply that it will increase the amount of refining done in these communities? It's simply that the refining would increase in those downstream communities. There's nothing different about refining waxy crude oil. I would have thought like the wax. I just got this vision of wax like clogging up the machine, but maybe not. You have to get the wax out, right? I'm sorry? You have to get the wax out, I would assume, right? They would have to heat the tank cars to get the wax out, yes. But that doesn't cause an emission that's part of your environmental justice community's argument. Yeah, I guess the way—the record just doesn't speak to what the difference between refining waxy crude is and refining other— It's out of the record, okay. Right, but that's the entire problem here is that they just never took a look at how downstream communities would be impacted by increased refining. They just completely ignored it. They had plenty of information to at least forecast that increased refining could harm air quality throughout the Uintah Basin. The Houston non-attainment ozone area, for example, is in severe non-attainment status. It has to meet Clean Air Act deadlines by certain federal deadlines. Adding all of this oil downstream to refineries will only make that problem worse and hinder progress in achieving those Clean Air Act standards. This was a major problem throughout the entire EIS. They never acknowledged that the project's purpose is to increase production and that these are the effects from the project itself. I guess just to then turn to our Endangered Species Act claim, as you were asking about, Judge Pellard. With respect to that claim, the biological opinion here entirely failed to address the potential for oil spills and terrain pollution leaks to harm the Colorado river endangered fish. Those are the Colorado pike minnow, the razorback sucker, and humpback chub and bony chub. The service had plenty of information before it from the EIS showing a strong likelihood of harm from spills and leaks. With respect to leaks from oil trains, the record reveals that over 3,400 oil trains would make the trip annually between the Uintah Basin and Gold Coast refineries or further east and travel along the Colorado River corridor right next to it. That means that every year more than 377,000 rail cars and over 27,000 locomotives could leak diesel, lubricants, grease, and other toxic fuels into the Colorado River or alongside it and run off into those waters. The EIS also predicts that with respect to spills, they occur once every four years along the Union Pacific Line between Cayenne, Utah and Denver. Over half of that length of the Union Pacific Line runs right against the Colorado River. Nearly three quarters of those spills would likely release 30,000 gallons or more, which is an entire tanker full of oil. I guess what I'd like to say finally about that is that the Fish and Wildlife Service Bureau tried to rely on the EIS's explanation for not addressing these effects in the EIS, but the biological opinion has to stand on its own as a final agency action. It had the ability to shape the board's decision regarding oil spills and leaks and because the Fish and Wildlife Service didn't consider spills and leaks in their biological opinion, it could have found, actually, if it had considered those effects, that the project should require minimization measures for those harms or should include terms and conditions for the implementations of those measures, but that opportunity was lost because it didn't consider those effects in the biological opinion. So it was very crucial for the Fish and Wildlife Service Agency to actually address them and even if the service could rely on the EIS's conclusions regarding those effects, the EIS just does not add up in its reasoning. The EIS is clear that leaks will occur and so that harm should have been considered. Thank you, Your Honor. May it please the Court, my name is Barbara Miller. I am here on behalf of Respondent, the Surface Transportation Board. I will start by addressing the environmental impact in the EIS. I think that was a prominent focus of the board's attention earlier and I think that the starting point for the discussion on that is that the board conducted a full and rigorous environmental review including a complete analysis of both upstream and downstream greenhouse gas emissions. There is nothing that the board could have done with respect to that analysis that it did not do. What about the impact on environmental justice communities and the refining of the soil? The analysis itself as to what the emissions would be was as complete as it could be. The assessment of the impact of environmental justice on potential environmental justice communities was something that we simply did not have the information. You had the information about at least what region this was going to be going to. You did not know which proprietary in particular, but you knew what regions it was most likely to go to, which is good enough for these purposes. We do not require proof beyond a reasonable doubt. And those regions were areas where there were environmental justice communities already suffering ill effects from the refining process and now there is going to be more. You told me they considered everything absolutely that could be considered. So where did they do that? As this court found in Berkhead and Pruden Water Watch in Delaware, impacts when you are not able to identify end use and you are only able to identify general regions of the destinations are not reasonably foreseeable. And therefore, by definition, the environmental justice impacts are not reasonably foreseeable. This is what confused me about the decision because it seems like things were foreseeable for some parts of the decision and not for others. Where this is going, there was no question it was going to hook up with the Union Rail Line and go through Colorado and go to these certain refineries. No one thinks it is going to New York. No one thinks it is going to California. It was Texas and Louisiana refineries that was going to this region. We don't know which refineries. We don't have contracts for that. But we know with some comfort level of knowledge that it is going to refineries in a region. They said that, correct? The board said that. Okay. So they found that it is going to a region. And that region where the refineries are, no one is arguing they are going to build a new refinery. So where all the refineries are in that region, there are environmental justice communities, correct?  It depends. There are 31. It is not that the refineries in these regions are all on one street. They all affect one potential environmental justice community. It may be more than one community. But the impact, there is going to be, are there refineries in this region that are not surrounded by environmental justice communities? The air quality status within the state, for example, the Houston, Port Arthur region, are not the same without. And therefore, you cannot. They are not the same? They are not the same. If you look at the attainment levels for each of those areas, what is in Houston is different than what is in Port Arthur. And we are talking about in the Houston area, there are 15 different refineries. And Houston and Port Arthur are almost 100 miles apart. So we are not talking about a single community. No, I'm not saying it's a single community. All I'm saying is around the Houston refineries, are there environmental justice communities that will be affected if it's refined there? Again, because we are talking general regions, I do not think that those are the impacts on those environmental justice communities are reasonably foreseeable. The board went over and above. I'm just asking a fact question. I'm just asking a fact question. And that is, are there environmental justice communities around the Houston refineries? There is no information in the record on that. There's no information in the record on that? Not that I'm aware of, no. And Port Arthur refineries aren't surrounded by environmental justice communities either? Again, there is no information in the record on that. However, I will say that the air quality levels are substantially different in those two areas. So there is not one simple thing to say, if it's going to this region, here is the impact. It may not be one simple, but they could say if it goes here is the consequence. We think these are the two most likely areas, or three, or four. And if it goes here, here's the impact. And if it goes there, there's the impact. But we've narrowed it down geographically as they have here. We have no idea where in the United States this is going. Well, first, this is an estimate and a prediction based on multiple factors that are subject to change. And multiple factors that are outside of our control or prediction for when you're talking as far down the timeline that we're talking that oil is actually going to be at the point where it will be refined. But Ms. Miller, there's something very striking about the decision in this case, which is that all of the rationale for the project is to enable the exploitation of the oil resources in the Uinta Basin. And it's saying, look, we've got this valuable resource here. It's kind of locked in there. The isolated empire, as Utah puts it, limited capacity to refine in Salt Lake. Let's build this train line, put it onto the Union Pacific. And then it can be put into the economy and sold and used. Now, there's no scenario before the board that would involve only using this in ways that had to do with lubrication and didn't have to do with burning. That's just not the case. The case is, let's get this stuff out of the ground and get it to the world market so it can be combusted and used as fuel. So that's the development, the financial case. This is the public works. This is allowing Utah to get at and get tax revenues and royalties from the exploitation of this valuable resource. So that's the transportation equities. And then on the other side, it's like, but we have no idea what's going to happen with this. Maybe it's just going to be used to send alfalfa to cattle in Colorado. No, right? That's not the case here. And so it just begs, it's just hard to understand the logic at a really, really basic level of the service transportation board saying the productivity that's going to be spurred by this project is something that we're relying on. But the environmental effect of that very productivity is unforeseeable. We didn't say it was unforeseeable. So we considered those impacts. We did not close our eyes and pretend that no oil was going to be transported on this line, despite the fact that while that may be the coalition's purpose, what we were being asked to approve, which is all we can approve, is a common carrier line to provide service to the basis. And we openly and repeatedly acknowledged that the primary tenacity on this line was going to be oil. And so we absolutely addressed that thoroughly and completely and looked at every aspect. If you look at the upstream development analysis, we looked at everything that could possibly create greenhouse gas emissions and calculated what those would be. Using the very limited information that we had, because none of these projects are even in the planning stages yet for this upstream development, the coalition is going to have no involvement with those. And that was not part of the project that was in front of us. So the idea that we did not acknowledge that the primary commodity, particularly initially, was going to be oil is just not supported by the record. We looked at it. Well, you say it's going to be used, but you're not attributing it to the project. And I guess, is that right? You're not attributing it to the project? Well, I think, as the court noted earlier, cumulative impacts are impacts from the project. But am I right in reading the board as having said, in effect, that we treat those things as happening, going to happen in the future? We look at a future scenario in which there are a lot more oil wells and there are a lot of oil trains shipping along the Pacific line. We treat that as the state of affairs. And then we're assessing the incremental contribution to the cacti and the fishes and the greenhouse gases of the construction and operation of the project line. Is that a correct analysis of what the cumulative effect treatment was? No. What we did here was we fully analyzed greenhouse gas emissions from construction and operation of the line. And then under the cumulative impact categorization, we looked at all of the greenhouse gas emissions that could conceivably result from upstream oil well development in the basin. We estimated the number of wells that would be needed to produce the oil to meet the low and high production scenarios. We looked at the likely types of wells that would be built. And we looked at what emissions could be caused by both the construction and operation of those wells. We looked at what other facilities, such as terminals and other ancillary facilities, that would likely be built in connection with that oil development. And we examined the greenhouse gas emissions from both the construction and operation of those facilities. We looked at the effect of increased traffic in the basin carrying oil from the ancillary facilities and the wells to the rail terminals. There is no source of greenhouse gas emissions with respect to that upstream oil development that we did not look at. And downstream? Again, we don't have any information on downstream. Well, there was the rough, there was the high and the low production. And so we did a full burn analysis, which is the most conservative estimation we could have done because, as we noted, it is very unlikely that none of this oil will displace existing oil and that all of this oil will be refined. So we looked at the upper limit of what greenhouse gas emissions could be. Right. And I don't think that the petitioners are disputing that, but what the question was, was not whether you identified it, but how you characterized it. You said you looked at the cumulative effect, the construction and operation of the line. And then you said you looked at all that can conceivably result from upstream activities, downstream activities. I take it that the paragraph break between those two, when you talk about all that can conceivably result from upstream and downstream activities, you're treating those not as effects of this project. Is that correct? No. It's not correct. Cumulative impacts are impacts from the project. They are simply, as the regulation states, they are impacts in which third parties are involved, in which there may be intervening actions, or they are not regionally close to the project, but they are impacts. And there is nothing in the regulation, nor I will point out in the board's decision, that says because these are cumulative impacts, we are treating them any differently than indirect impacts. These were all considered. How could, what was the question the board was trying to answer in approving this project? It wasn't looking at whether it was financially viable. It's clear about that, right? It wasn't looking at whether it was, as an engineering matter, feasible, because it kicked the can down the road on geologic effects. It wasn't looking at whether it was good environmental policy to enable the extraction and exploitation of oil at a time when, you know, to contribute potentially large amounts of greenhouse gases. So what was the checkbox saying, like, this is a great idea, or this is an acceptable idea, or this is permissible under what our remit is looking at? Well, I think that's an important question. We are a transportation agency, and if you look at the construction statute, there is an affirmative presumption that we shall approve construction applications or exemptions unless it is inconsistent with the public convenience and necessity. And so it is in determining, there's the affirmative presumption that we should be approving. And that is our starting point, and that is the first question before the agency. Keep going. And so when you look at the exemption process, then you look at the RTP factors, those rail transportation policy factors, and you weigh those that are relevant. And that encompasses all of those policies, whether they be competition, whether they be the sound economic policy or transportation policy. In what respect is the sound economic policy? I just found myself really unable to understand that if you're bracketing the notion that it's going to be financially feasible. That's the problem with the counties, right? If it's out of their pocket, I guess the dissenting commission recognizes that the market is very soft for this commodity, so there's no private oil company jumping in to try to pay for this rail line. So when you look at the economics of it, from the STB perspective, what are they? I'll give you a second. The board does not assess the financial viability of a project. We look at the transportation merit in the context of our statutory mandate is to promote rail transportation. And so we have repeatedly said the financial viability of the project is something that we don't look at and is something that will be determined by the market. Our grant of authority is permissive. I understand that, but you were referring to, and I'm just looking for the statute so I have it right in front of me. One of the rail transportation policies is economic conditions in transportation. What does that mean? I think that that is a very broad policy type factor as to whether this fosters development of the rail transportation network. Always, building new rails, always. It feels tautological. Is it more than tautological? I suspect that in most cases that does support granting it, but again, it is one of 15 factors. And yes, our statutory mandate is to foster development and maintenance and health of the rail transportation network. To reduce regulatory barriers to entry. Approving a rail line with very little scrutiny is, again, it feels tautological. Let's not regulate. Come on in. What was the scrutiny on that factor? The question is not, let's reduce regulatory barriers regardless. It is that that is one of the factors that we need to consider. And if you look at 105.02, again, there is the shall language. No, I know. I understand that. I'm trying to understand the factors and kind of because the order is pretty general and somewhat tautological. I mean, I love trains and I appreciate that you have a narrow remit and that we're not doing de novo review by any means. So, I'm just trying to get a better appreciation of what you are actually scrutinizing for and what would be a red flag and make you say no if it's a new rail line. There's not a problem of market power. There's competition. Not really on this record. But, you know, what are you really trying to sniff out? Again, it is a weighing of a combination of factors. Both the transportation type factors such as does this foster competition and reducing barriers. And again, the reducing barriers is a mandate that we have received as something we need to consider.  I appreciate that, yeah. But it's just what would be a project where expedited consideration wouldn't reduce barriers or where you're saying go ahead without more scrutiny wouldn't reduce barriers. What it is is that it's not necessary. This is not a case in which it's a matter of unnecessary regulatory barriers. So, are we going to make them jump through additional hoops that are not going to and file additional papers and answer additional questions that ultimately don't serve a rail transportation policy purpose. I'll give you an example. How about Texas Central? When you all said there are so many questions about the financial viability of this project that we're denying an exemption and they're going to have to go through the full 10901 process and then comply with your regulations which require disclosure. Your 1150.6 requires extensive financial information disclosure. How is that reconciled with the board statement here that we don't care about the finances? In that case, it wasn't a matter of you need to tell us where the financing has come from. That was a case where the estimates of the cost changed over the course of different filings where there was insufficient explanation, there was contradictory information. Why does it matter if you don't look at finance? All you're doing is figuring out should we have a rail line here or not and if we say yes and they never build it, oh well. It's not mandatory, it's permitted. I think that in Texas Rail, enough of an issue was raised that frankly we couldn't sort out some of the important aspects of the project again. What does it take for enough of a financial issue to be raised? There's plenty of question marks here that have been raised and the board noted some of those arguments but it doesn't matter to us at all. When you get this heavily redacted document about financing and then there's just these questions, we're going to try this, we're going to try that, nothing's pinned down and the market for waxy crude oil, shall we say, is not piping hot. I don't understand why that's not enough. It doesn't matter what I understand. I didn't see the board explain to us why this was different, materially different, so that we didn't need to go through that process. Well, I think if you look at the cases we cite too, we do note Texas Central and we do note why that was different. Tell me what the board tells me, why that was more... The board says that was so different. There are notations and I will look for it while I continue. Sorry, I was trying to argue a question. I do not recall whether it was in the preliminary decision. I believe that was in the preliminary decision and not the final decision. They don't have to reconsider that as part of transportation merits at the final decision? The information did not change. So financing didn't get any better? There was no additional information that would have caused us to further question and need to reevaluate that. And again, the financial viability is not specifically one of the RTT factors, which is why we generally leave it to the... I was a little confused. I wasn't sure which factor it was, but then you've got these cases that go, hang on, hang on. If we have big question marks, we are not going to give you an exemption. So it sounds like it might be baked into one of these economic factors. Without knowing the specific cases, again, I think that Texas Central is one of the few, if not one of only two cases I'm aware of, where the financial viability was a serious enough issue that we felt it went to, that more information was needed or simply that the application would be denied. And in the majority of cases, when it's simply a question of, will this party get enough financing, that's not something we look at. That's not something we leave to the market, and that's a long-established practice and position of the board. I think it's J7. Yes, I believe you are correct, and that's where we discuss those cases and the fact that we leave the financial issues to the market. I think it doesn't include inconsistent statements from petitioners It just includes no explanation except a heavily redacted document that we can't see. And so that's the material difference. They say, unlike Texas, there are more inconsistent statements. We have Stephanie in silence about how they're going to get from the, whether they have the $27 million to the enormous amount of money they're going to need to build this thing and operate it. I don't believe that the estimates for the cost of the rail line were inconsistent. So inconsistency is the only thing. It's not the only thing, but it was one of the primary factors in Texas Central. It was there. I'm just trying to say, is it a reasoned decision to say, well, they haven't been inconsistent because they haven't told us anything. Is that a reasoned distinction? And again, I don't think they told us nothing. There was information about financing, and that R&L Bank report, I don't believe, is the only source of financing information in the entire record. There's some uncertainty in the financing beyond the $27.9 million. And that means that they have not actually detained the bankers or the investors to fund this, not that they don't even know how much the rail line is going to cost, which was a significant part of the problem in Texas. And the costs here are, this is totally off the top of my head, with a lot of other facts and figures from other cases, like $1.5 to $2.5 billion? Based on my memory, Your Honor, yes, I believe that's accurate. And if you look at it, that should be in the purpose in the chapter of the EIS, that discusses the costs. And I should know this, and it may be in the briefing, but the reason why the STB's environmental arm does the environmental impact statement here is that's just always the case? Yes, that is an integral part of the board, and they do the environmental reviews on behalf of and for the board's use. And do they work with EPA? Do they work with the Environmental Protection Agency? Do they work with who? Does the OES work with the Environmental Protection Agency or not? They work with every agency for which they should consult under NEPA. And so in this case, they are acting as the board in the EIS process, and as the board in this application was the lead agency, they consulted with multiple other federal agencies, including BLM, Fish and Wildlife, Forest Service, et cetera. Can you say anything about the challenges of inadequate consideration of landslide risk and lack of appropriate geological mapping, that challenge? So the argument with respect to the geological mapping misrepresents what the board did and what the board looked at. If you look at the record, there is a list of data, multiple data sources that the board used to assess seismic and geological risks, including for mass movement. The incomplete mapping was of one single formation. We acknowledged that the mapping for that particular formation was incomplete. We pointed to the other information that we had to assess geological conditions, and we made an affirmative statement finding that it did not affect our ability to compare the alternatives. Thank you. So on the geological, would it be within the board's power to sort of hold the petition subject to engineering review that says there's not going to be an excess landslide risk? So again, the board was confident in this EIS and made the affirmative finding that it could make a reasonable determination of landslide risk and that the imposition of the mitigation remedies for that for when the actual construction occurred would be adequate to address that risk. And again, so this is equally in the coalition's interest to build this line in an area where there is not going to be a landslide that's going to destroy their railroad. So it's not as if there would be some economic advantage to the shortcut here. And I think if you impose the requirements that it seems that Petitioner CBD wants, that we could not approve the project until we had done field surveys and geological engineering for every inch of where these hundred-mile lines were going to be, then we would never approve a line. And if there hasn't been any stay or anything like that, they could go ahead with the building? This is on appeal to us? They have, as far as I know, theoretically they could go forward, but certainly this project I don't think my co-counsel will be in a better position. I don't think it's near to breaking ground on anything because there is much preliminary work to be done from acquiring property rights, et cetera, and that type of thing. But as this court held in several cases, including public utility commissions of California, it is appropriate to have adaptive mitigation and requirements as to what the applicant must do and have those implemented when the exact right-of-way is determined. And it has not been determined yet. It may shift by a few feet here and places because of engineering challenges. And again, the board looked at the type of engineering solution so there would be two landslide risks and felt that there was no risk here that could not be mitigated by engineering and design on these three alternatives that were examined and certainly on the one that we authorized for construction. Do mitigation risks say that if the landslide risk reaches a certain level, 50%, they should not build there or it's just do a survey so you know what the risk is before you build? It is that they are required to mitigate the risk. They have tried to assess and mitigate and they are required to report back to us that they have done so. Mitigate how much? I'm not sure what that means to report to you that they've done so. All right, we discovered that there's a 90% chance of a landslide here. We've got it down to 85. Just letting you know. I don't believe the EIS or the mitigation assigns a percentage to it. But again, if there is a significant landslide risk, then there's no point in constructing the rail line. Because the landslide won't take out the rail line. If the risk comes from where they're building a well, the wells aren't going to have to be right next to the rail line. They build more wells because of this and that's where you get landslide risk as well, correct? I thought we were still talking about the right-of-way. If we're talking about landslide risk from wells, we can't assess that risk without knowing where the wells are connected. You could impose mitigation measures. Any jurisdiction or authority over the development of a well. The railway shall not transfer any oil that is not produced through a process that engages in mitigation of landslide risks. No oil that isn't produced through a mitigation process and analysis shall be transported on that railway. You could do that, couldn't you? I think that that would make us a policeman for commodities. So you're disavowing your authority to do that. I don't believe we have the jurisdiction to police commodities in that way. We are a transportation agency. There is a long-standing, unchallenged principle that rail service, request for rail service will be provided regardless of the commodity. And if you get us into the business of policing the types of commodities that can be carried, that's inconsistent with that. And it makes a transportation agency the arbiter of what products come to market. And that's clearly not part of the scope of our statutory authority. It's beyond what Congress has envisioned for us, looking at our statutes and even looking at payment. The board has never put conditions for safety and health, public safety and health, on what products can go in. On the commodities, not before they are on the train. And it's FRA and PIMSA. No, no, just conditioning what can come on the train. Again, that is beyond the scope of our authority. We are not the arbiter of the commodities that are carried. That is, if you look at our statutes, that is well beyond what Congress gave us the authority to do. We are a rail transportation agency. And so we can impose requirements on the rail carriers and the rail lines. But once we start issuing edicts about what rail lines are allowed to carry and what they are not, we have now violated the underlying event of inconsistency with the underlying principle of... But aren't you always, when you're looking at public convenience and necessity, and something going off into Alaska that's going to open up, you know, communities for tourism, for people who live there, to allow people to commute to work, I mean, you're always looking at that. I think that... Is it FRA, is it commuter, is it both, is it... If I'm understanding Your Honor's question, I think that... I think it's an open question whether the boards could ever, whether the environmental impact of the commodities being carried could ever overcome the presumption that we grant construction petitions. Clearly, in this case, the board did not think that they... Sorry, just because you just said, while the statute requires this balancing, you don't, you can't imagine a situation where the environmental consequences would ever outweigh the presumption in favor of building. I misunderstood what you said then. What I said, or meant to say, if I misspoke and I apologize, was that it is an open question that the board has not addressed whether those impacts could be great enough to overcome that presumption. I think that... And again, the board hasn't answered that question. I think that, theoretically, there could be an instance in which it could, but it did not hear. And I think there's two questions here. One, could the environmental impact overcome that presumption, which they didn't hear, because the board clearly weighed those impacts. And two, even if they were more significant, there's the open question of whether that puts us in the business of regulating commodities and whether we could do that. Well, you pretty clearly here thought about the broader economy consequences for this region as part of your transportation merits. The board clearly did that. We looked at it certainly as part of the EIS. Even part of the preliminary decision on transportation merits, whether this is going to allow economic... It doesn't sound like transportation or trains to me. It's going to allow economic development, diversification of the economy. It's going to allow... That's going to enrich the lives of the people who live here who will now have more ability to grow more things and do more things and move things in and out. But you can't... So you can consider that on the transportation merits side, but you cannot consider the cost of doing this is landslides in people's backyards. We looked at landslides from the rail line, and I will say without... Not from the rail line. It's from oil wells, from the oil wells. And we looked at the geological risks related to wells. We gave our assessment of the impact to the extent that we could without specific well locations. But you just said it's out of your wheelhouse to factor that in. I'm sorry? You just said that's out of your wheelhouse to factor that in because there's nothing you can do to mitigate it. So there's nothing we can do about that risk, the oil well landslide risk. Whether we can mitigate something is different from whether we consider it as an impact. The ability to mitigate that is outside of our wheelhouse. The ability to promote things is in your wheelhouse, but the ability to mitigate things is not. I'm not sure that's a fair characterization. You're promoting economic development. You're promoting diversity of transportation options. That's promoting things that are not transportation. But promoting them is different from imposing mitigation. I just said exactly that. You can promote, but you can't mitigate. It sounds like that is your position. We can acknowledge both the benefits and adverse impacts from our decision. What we did both with respect to diversification and economic development in the basins as well as impacts for geological risks, which were in fact addressed with respect to upstream oil development to the extent they could be, was expressly addressed without knowing the exact location of where these wells were going to be because we have no information about that. Okay. Is there any more questions? No. Great. Thank you very much. We kept you up for a very long time. Thank you, Your Honor. Mr. Heminger? I'd like to wish you good afternoon. May it please the Court, Justin Heminger for the U.S. Fish and Wildlife Service. I know we've been here a while, so I'll try to keep this brief. I have two points to make. The first is on standing, and then I'd like to address the merits of the challenge to the U.S. Fish and Wildlife Service's biological preservation.  So first, the petitioners lack standing because they don't face an injury, or their members don't face an injury, that would be caused by this biological opinion. And I'll just try to boil it down to what I think is the basics here. The petitioners, in their reply brief, assert that they face a risk of injury, that their members face a risk of injury. And that risk to them comes from, they assert, comes from the risk of an accident happening not on this new railroad, but on the existing Union Pacific line. But if they're right, I mean, we tend to address standing, even in a case in which we're disposed against the plaintiffs on the merits, we tend to address standing by assuming that their claim would prevail, and looking at whether it would redress the harms they assert. And here, they're saying, you should have treated the risks on the Union Pacific line as caused by the project and addressed them differently. And if they get relief, then wouldn't that redress their claim to injury? So there is a little bit of overlap here between the merits and the standing inquiry, but our position is that, even though standing is a much lower bar, that they haven't even met that standard. They have people who like to go on the water and see these fish. So we don't, we certainly agree. So they submitted declarations, and the declarations say we use the river, we like the fish, and we don't. And their natural fish aren't going to be there, or there are going to be a lot less of them, or they're going to be covered with waxy globules, if you build this thing. Why isn't that sufficient? Because there's a lack of evidence that that's going to happen. So we're talking about whether there's a substantial probability. A substantial probability. That really is completely collapsing the merits, then. The court's decision in Publix's and UNITSA says that if you're looking at injury caused by a future risk of harm, and here we're talking about... These trains are going right by the top. This increase in trains is 100% attributable to building this new line. Right. Those extra nine trains a day would not be there but for that line, for standing purposes now. And they're going right by the Colorado River. And all I get is pick up a newspaper to realize that trains tip over sometimes. Right? And the more trains go in, statistically, the chances of more trains tipping over are greater. Especially when they're great big, long, very long, very heavy trains filled with very flammable and leakable and leachable substances. So I don't know what more they have to show. I'm happy to turn to the merits if the court... I'm sorry, I'm just... So I would break it down into three steps here to sort of think about the risk, the potential risk. The first step would be to look at the risk of an accident and the second step would be to look at the risk that the accident results in a spill and the size of that spill. And then the third step would be to think about this Union Pacific line is about 450 miles long. Not all of it is next to the Colorado River. Only about half of it is along the river. Only about half of that is actually critical habitat, fishes. So starting with the first step, the risk of an accident is between .31 and .89 trains a year. That's the loaded trains. That's the train that could result in a spill. Is that based on the national statistics? Probably. It's the evidence that's in the record. Well, there's enough evidence in the record that actually the accident risk goes up when you have very long, very heavy trains. The petitioners didn't point to that evidence. It's their burden. This is their reply brief that they raised. I saw it. They must have pointed to it. Well, they may have pointed... I'm sorry, they may have pointed to it in relation to a different argument. I'm talking about the environmental petitioner's case for standing here. So they're saying there's an accident and the risk is in the low phase, the low oil production scenario is .31 and the high is .89 trains. Then you're going to multiply that by the risk of a spill. And here I just want to point out, in the petitioner's reply brief, they say 73% of those spills are going to result in 30,000 gallons or more, a spill of 30,000 gallons or more. And they're citing the JA 1201. We disagree with their interpretation of that. We think it's inaccurate. The risk of a spill of more than 30,000 gallons is closer to 2% of all accidents that would happen. So if you're looking at a train accident every four years... I think officials would be unhappy even if it's less than 30,000 gallons. And then there's the perpetual sort of leaking oil stuff that comes off of trains that there's that risk going on, right? There's the vibration risks going on. So there's... But I fail to see how that shows a substantial probability of injury to these plaintiffs. And that's my only point. Got it. But to turn to the merits, I think it's a fairly simple issue here on the merits, and that is the petitioner's argument came up in the NEPA process before the board. And before the board, they said, the Union Pacific Line is going to cause leaks and spills that would happen on the Union Pacific Line, and those will affect the fishes. The board responded to that argument and said, no, that's not a risk to the fish. That's a JA 1845 in the services administrative record. So that's the place in the record where the board addressed this issue. Where did the Fish and Wildlife Service address it? So the Fish and Wildlife Service did not address this issue explicitly in its biological opinion, and the petitioners say, well, they needed to do that. But the explanation is in the services analysis, and that analysis is in the board's analysis. That's JA 1845, and that's in the services record. So if you think about the process... I thought the Fish and Wildlife Service was the expert agency here on figuring out these risks and these impacts. Is there any case you can point me to where we said, for purposes of a biological opinion, it's fine for the Fish and Wildlife Service to just adopt what the action agency says? Let them do the analysis for it? Right, so on this point, I don't have a case from this circuit. We've cited a case from the 11th Circuit and also from the 8th Circuit on that point. And I think the fundamental point here, though, is under the APA, the question is, is it in the record? It's clearly in the record that the service looked at. And if you think about the... Maybe in the record, but having the Fish and Wildlife Service is taking it into account if it wasn't in the presentation. Thank you, Your Honor. So on that point, I would focus on the process here. Under the Endangered Species Act, Section 7 is a consultation process. So it actually is a give-and-take between the action agency, that's the board, and the Fish and Wildlife Service, which is the expert on these biological issues and the species. So if you start with the... what the service says at the very beginning... The consultation is the information, expert information that's coming from the Fish and Wildlife Service, and we don't rely on the Service Transportation Board, which we have been told quite clearly today is really about transportation and trains, not fish, not the environment, not environmental consequences. You each have your own wheelhouses here. So that's why it just seems a little upside down to me for the Fish and Wildlife Service to say we were consulting by letting the Service Transportation Board do the environmental analysis. And we said, okay, thanks. So on this specific issue, I actually think it is backwards because the board is the expert on rail transportation, on trains, not the service. And so the board's conclusion that the risk of a spill into Colorado, a major spill that would reach the Colorado River and affect these fishes, they're the ones that would be able to best assess what that risk is. And did you find... Not you. I haven't found it yet. Did your client agency find that the only thing that would affect recent endangered species about this entire process is a major spill into the Colorado River as opposed to constant drip, drip, drip of oil or a minor spill or a train car falling and smashing the fishes in the water? So this brings me back to the very basics of this biological opinion. In fact, what the service said in the biological opinion, and this would be as a fish, it's JA 1691-92, 1691-92, and then the conclusion is 1696. In the biological opinion, what the service said is you have a train line being built. It's not anywhere near where the fish are. At no point? It's not along the Colorado River? Not the new line. Not the new line that's being built. So all this... It's not talking about where all these trains are going. Right. So if you think about the new line and then it reaches tiny Utah and then it starts under the Union Pacific line, about 100 miles down the Union Pacific line, it begins to parallel the Colorado River. And for how many miles does it do that? About 277. Or 233, excuse me. 9 times a day. Roughly half the length. 9 times a day, but cars are going down this. Right, but it's the existing line. No, but 9 times a day, there's more trains. Certainly more traffic. And I don't know if there's much evidence that there's oil tankers going on this road already, on this track, not track, that road's track already. But even assuming there is a few. So there's now, the qualitative difference is that there's now a large increase in traffic volume. And it's carrying a very, very toxic substance. Yes, but the board looked at that risk and this is J1845. The board said, the risk if there would be a major spill that would reach the Colorado River is very low and not reasonably foreseeable. So the question for the service is. Because the board told me these accidents won't happen very much. Right, so. And then where do they analyze something short of a major spill? Could you say that again, please? Where does the service analyze something short of, short of a major spill happening? So I think the, this is sort of implicit, I guess, in the board's analysis. But implicitly, less than major spill would not reach the river. So it wouldn't be a risk to the fishers. And the Fish and Wildlife Service didn't think it needed to make any independent decision about that. They didn't make an independent, they didn't say in the bylaws. It's right along the river. So I understand, so there's some tension here, right? So that you would think this would be something the service would say. They would just say, the board has told us there's a low risk. We agree. We're not gonna, we don't have, you know, we agree. In the back and forth, in the consultation between the board and the service, each agency is playing a role here. The board's obligation is to provide a lot of information to the service to facilitate the consultation. But they also provide their own view that it's in a biological assessment. So the board prepared a biological assessment and said actually the fish may be, they may be affected by this action. Their concern though is from water depletions that would be related to construction. So they share all that information with service. That information they share included the spill risk to the fishers. And that's, so in the first page of the service's biological opinion, they say, this is JA 1648, they say we've gotten all this information from the board about this project. We're considering it. We're looking at it. And here's our opinion. This issue is, this issue of could there be a major spill that would affect the fishes in the Colorado River, I think from the service's view is peripheral. It's just not something that they would go out of their way to affirmatively a negative state in the negative. We looked at this and we conclude, as the board did, that this is not an indirect effect of the action. Any other questions? That it's not an indirect effect. Correct. And I should say, since we've been throwing these words around, this is under the ESA. So under the ESA, the regulations, this is at 50 CFR 402.02, the regulations definition of indirect effect is specific to the Endangered Species Act. That definition is, it has to be caused but for by the project and also has to be reasonably certain to occur. So the standard here is, is this effect, is a spill into the Colorado River reasonably certain to occur and affect these fishes? And it's not, maybe they have standing, but it's not a close call when it comes to the question of, is this an effect that the service needed to study? Is the law in our circuit, though, pretty low bar as long as it may affect an endangered species, a consultation? Judge Wilkins, that's the standard for formal consultation and that certainly applies here. The board thought that this may, the water depletions from this project may affect the fishes. So they went through the whole formal consultation process. I think when it comes to looking at individual, whether the downline operations are an indirect effect, you look to the regulation on indirect effects and that says it has to be reasonably certain to occur. Thank you very much. Thank you.  Mr. Johnson, you've been waiting patiently. May I please record, on behalf of the interveners. I thought I would start, given all the stuff that's come so far, is maybe with a question from Judge Millett about, is waxy crude different in terms of how it might be refined? And there's actually evidence in the record at JA 789, which says a large portion of the Uinta Basin crude is likely to be used for lubricating oil feedstock, not for the manufacture of combustible fuels. So I do think that factors into the reasonableness of the board's downstream analysis, especially as it relates to greenhouse gases and maybe even to environmental justice. The board was ultra conservative, as Ms. Miller said. They did a full burn analysis. They assumed every drop would be burned and that's how they calculated greenhouse gases. But the evidence in the record is that a large portion won't be burned. So I think that's relevant to the greenhouse gas discussion, to the reasonably foreseeable discussion, and to potentially environmental justice concerns. The other thing I would add about environmental... Where do they address... We assume that stuff is going to get burned, the impact on people who have to live around this refinery. Right. They do not talk about, as Ms. Miller said, the record doesn't talk about environmental justice concerns around particular refineries. It doesn't talk about proportions anticipated to be used as lubricating oil feedstocks versus other kinds of... Lubricating oil feedstocks would be refined too, wouldn't they? They would be refined but not burned so that they wouldn't generate greenhouse gases. I thought you related that to the environmental justice concern, which is the refineries. Right. It would be refined. It would be refined, that's correct. Where is it on J79? 789, I'm sorry. That's a very different number. And then they're used for what purpose? Lubricating oil. I guess like motor oil, things like that, that isn't ultimately burned. I'm sure there are other... Lubricating oil in my car is burned. But it's an old car. So... I mean, so what is your understanding of the limits of our role in this case? In terms of reviewing the boards? Yes, yes. What should we be paying attention to to make our review meaningful but to keep it within appropriate bounds? Well, I think, you know, stepping back for NEPA purposes, you know, the real question is whether the board's review is enough to inform the public and to inform the agency's decision-making. And so long as it does those two things, which I think it does, I mean, you can just... The way that the petitioner's council started their whole argument with the number of oil trains and how long they are, all that stuff is in the environmental impact statement. It is. But what about the ICCTA determination? It... You know, one concern is if you're going on a less public route, this abbreviated route, do the taxpayers of Utah know that this is a public development project that's going to be funded by bonds, that would be, I assume, ultimately on the taxpayer's bill, and it's going to create a quite striking amount of greenhouse gas at a time when oil... Markets for oil are somewhat flagging. So it's like... I mean, one way, and I'm obviously being tendentious on purpose to give you an opportunity to make your best case, but so the state is going to go into debt in order to subsidize an industry that is flagging so that it can drill more oil and compete, you know, be more cost-effective in competing with rising non-fossil fuel alternatives like wind and solar. Everybody... All the political forces in Utah are totally behind this. Is that... What's wrong with that description? I would point out a couple of things. The first thing is this isn't being done behind closed doors. The Southern County Infrastructure Coalition is a public entity. It has public meetings, and so... But the people aren't elected to it. There are extra positions. There are people who are in positions... I believe that's right, but they are, but some of them, I think all of them are representatives of the counties, so there are elections. Your economic study from R.L. Banks I'm sure wasn't open and transparent. Well, it's been redacted to block out competitive information, as I understand it. There are other studies... You don't... And I take it the board doesn't accept sealed materials, so the board would have a sense of this competitive information since competition was part of his decision. I don't know that the board even asked us to submit it under seal. It's an offer. But... If they ask, it's an offer. True, but we cited in our petition another study that's from 2011. It's called Uinta Basin Energy and Transportation...  2013. But these studies take a long time and they're expensive, so they don't happen all the time. But if you look at JA-261, you can see a citation to that study, and it's got a link, so it's public. It's a Utah study, and it says some of the same information that's in the Arnold Bank study. Including the redacted... It says the same information as redacted? Some of the same information. Well, then you can un-redact that stuff. An earlier version of the same... Right. Well, I think some of the... Some of the redactions have to do with pricing information, this competitive information, you know, and so on. Competitive with who? It's the pricing of the... Because this is a stand-alone project. There aren't a lot of people competing to build it. Well, it's pricing of at least some of it, and I don't... I'm not going to stand here and say I know exactly everything that was redacted in there, but having looked through it, some of the big blocks are prices of the railroads and how much they anticipate BNSF would price versus UP would price, and that sort of information, I think, is important. To be the party that would build it. To carry the rail... To carry the trains from the end of the new rail. Got it. To allow them to run on the Union Pacific.  Or BNSF. They can also go on that. And that's the competitive part of it. I see. But just to circle back to Judge Pillard's question about why build this thing that, you know, if the market for oil is flagging or things like that, I mean, I think part of the answer is that infrastructure isn't for a short-term gain. This will be here for 100 years or 200 years, like the UP line has been. And the people who live in the basin aren't only oil companies or oil producers. There are farmers and ranchers and other people who even decades from now when there might not be any more oil being shipped out, there will still be a rail line that these people can use to ship out their grain or their aggregate or whatever it might be that they have. And that will help them be competitive in the national economy whereas now to get to the basin is difficult. But that alone, I mean, this would not be closed on your radar screen. I mean, maybe it would be on yours because you represent this particular area. But the notion that of all the possible development projects, the thing that animates this one is the idea of exploiting this oil resource, right? It wouldn't happen without that. There's no question on that. There's no debate about that. The oil is the source of the funding for a long-term piece of infrastructure that will exist even when... But it is and it's not. It's a source of some funding, some tax and royalty revenues but not enough that it could actually carry the cost of putting in this or contributing anything to this infrastructure, right? To this piece. You mean the oil companies or other people? Yeah. So I... The financing of things like this is complicated and not really part of this case as far as I'm aware but the knowledge that those revenues can be there is part of how you can get financing from banks and other sources. That's the simplest and probably the best I can do to explain. So what are we supposed to be scrutinizing and what are we not supposed to be scrutinizing here? Well, I think as the Surface Transportation Board's attorney said, real projects like this are presumed to be in the public interest. I think there are lots of good reasons why this particular one is in the public interest that we've just been discussing. So I think there's a lot of deference owed to the Board's determination that this is in the public interest. Is that... I understand why it's in the interests of the people around this area. Is that the relevant public interest or are we looking at the... Do we look at regionally instead of including people in Colorado or do we look nationally where we're now going to have a 1% increase in our greenhouse gas emissions? How do we... I just don't know maybe there's a regulation on this. When you say the public interest and how narrow or broadly do we look at it when you're talking about sort of a... We're going to start with this development and that's where the new line is going to be is in this area of Utah, but it's going to go into Colorado and it's going to burn stuff that's going to increase the entire nation, not to mention the world greenhouse gases. Sure, and I think that the Board overweighed all of that as well and again... Well, then I think we can't say this is a public interest project that everyone agreed on, right? That it's very much disputed then. If public interest is... There's different public interests then it's very much in dispute, right? There's definitely a dispute over whether this is in the public interest considered broadly, but the Board knew that dispute. The Board understood what the arguments were on both sides of the issue. The Board had a complete environmental impact statement in front of it and it weighed all those things and then rules that the project should be... How much weight does it do? It tells us it has a sort of strong presumption in favor of build the railroad and given that strong presumption, if... Where do you see them doing a really sort of substantive evaluation of that against one percent increase in U.S. greenhouse gas emissions from this little pocket in Utah that's going to affect the whole nation and the world and that it's worth it because this waxy oil which has an unknown demand for an unknown market that presumably is going to go down at some point in the hundred year scenario you offered is worth it against the extraordinary environmental and public health consequences of this. I just didn't see that kind of serious balancing. I don't know if it's the presumption means they really... They need something much more catastrophic before anything will ever outweigh it or I'm just not sure. Where do you see this sort of substantive fair balancing? In the Board's decision, it starts on Joint Appendix 28. There's a paragraph where the Board says that it has assessed OEA's conclusions regarding environmental impacts and fully considered the environmental record. That sort of is the lead-in to pages of discussion of all the things that are in the environmental impact statement including the greenhouse gas discussion and the upstream oil... That's not the balancing. That's getting the data before we... You have to get the impacts all on the table before you... You don't say we're balancing when we put all the data because we're getting the data on the table or putting them on their different scales. So now they've got everything on the scales and we've got this area in Utah that's going to be able to develop its waxed crude oil and maybe eventually ship some cows but really this is about developing waxed crude oil and it's certainly important to people in your community. I'm not diminishing that at all. It sounds like it's a very difficult economic area because of these transportation constraints. And then on the other side we have what they acknowledge is going to be some severe economic... Severe environmental impacts and these protected species and protected plants and critical habitat all along here and by the way 1% greenhouse increase in our national greenhouse gas emissions at a time we're supposed to be going in the other direction. And so now we've got everything on... So all those animals and plants and water and air and the people inhaling this stuff in the refineries that's all on the scales. Now where are they doing that balancing? So I would say that they're doing more in these pages starting on 28, JA 28, than just putting everything on the table. If they wanted to just put everything on the table they could have said there's an EIS it's a few hundred pages long. We looked at it. Here they actually go through the analyses in the EIS and give it some additional... It seems like they're kind of ticking things off one at a time instead of looking at... When I think of the balancing and maybe I'm wrong about this but I think of the ultimate balancing it's going to have to be okay there's that impact but we can tell you okay I know there's this impact but you've got to do them cumulatively. You've got to put all the environmental impacts on one page and then do that ultimate final balancing. Where do I do that? I don't think there's one... There is a section at the end that's called weighting environmental impacts but I think it's better to look at the decision as a whole. I mean I would say the one place where they have all the impacts is the entire decision where they discuss... But then they start picking them off piecemeal instead of... They do have to look at it cumulatively don't they or not? I think they do and I think that the board is of some deference in how it handles these things and how it discusses them. Absolutely but I have to have a decision to defer to where they've actually done that cumulative balancing. I think there's enough in the existing final decision that explains all the things that were in the EIS. I don't really know how they do it other than in series. I mean they go through and they acknowledge the seriousness of all the different impacts and then they... You need to add all the serious stuff up on the other end. So on the weighing part the board talks about the substantial transition and economic benefits bring real service to an area   that doesn't have it. Provide shippers that must now rely on trucks and other shipping options. It's really the oil extraction that's at issue there. And create jobs and I think the long term job creation that I saw was 50 to 100 ongoing jobs in that area. I don't recall exactly but I'm   So it's... And the notion of diversifying the local economy I understand your sense of what it's going to  Who knows a century from now. Railway lines do last for a very long time and because of that have that long projected value but in terms of assessing whether to build this it's not really about diversifying it's about further exploiting a resource that is only at a 20% level compared to what it would be exploited for this bill. So it's really about not diversifying it's intensifying one source of value. Well I think diversifying is part of it as well. I mean I'm not denying that the largest source of value is the potential for increased oil production and transportation but I don't think it's appropriate to completely overlook the other people who even if maybe they just put a single car onto the end of a long unit train are getting their crops or mining products or whatever it might be out of there. And they're not doing crops or mining products already? Well the best they can do now is put them on a truck and send them over. So it's not diversifying the economy. Might be cheaper to do on a  But it's just miniscule right? I mean like the Utah brief which starts with the sort of beautiful vision of this pastoral valley. One even wonders whether the people who are there have any idea what's coming if the oil extraction is you know really a going concern it's unclear whether this can be the paradise that they envision and they'll just get on the train and zip down to you know in their spare time. But that's not really the  concern. It's really about this valuable but landlocked resources. Again I'm not denying that the if you want to say animating concern is the oil. But I do think from the perspective of the seven county infrastructure coalition it's not just about the oil companies or the oil drilling it's about everyone who lives in the valley or the basin. And you know even if those people are only helped a little bit yes maybe they're already shipping some grain out by trucks but now they can do it cheaper or better or reach national markets that's a good thing from the seven county infrastructure coalition perspective and from the Utah government perspective. And that's in part why this is getting such broad support. But no passenger trains involved. Well who knows in 100 years. I know. But at present I don't think Amtrak has any plans to be going to Utah. Any other questions? Thank you very much. Thank you. All right Mr. Hunt I'm going to give you two minutes. Thank you your honors. Just really two points. One is about Eagle County comment letter where we mentioned the rail transportation policy promoting energy conservation. The comment letter is J.A. 734 to 773. We reference our concerns about that rail policy on page J.A. 760. Just wanted to briefly discuss water resources. And the weighing of environmental impacts by the board. The board's decision never mentions the Colorado River. The board's decision never mentions consideration of water resources down line at all. So in this litigation the federal agencies kind of put on their rose colored glasses in reviewing and reciting the administrative record. The administrative record shows that there was no analysis of what is a big spill. What is a significant risk. On J.A. 1201, the office of environmental analysis determines that one in four accidents is going to be resolved in a spill. And then it has some  analysis   It never goes past that. It requires that the board not only look at the probability of a spill but the consequences. There is no analysis of the  in the Colorado River in the record. And finally the characterization of what is a large spill, what is a small spill. The majority of the spills are going to be 30,000 gallons or more. The board suggests that that is insignificant. If you turn to the previous page, 2% would be 30,000 or more. 2% on J.A. 1201, the office of environmental analysis calculates that 2% of the spill will be 90,000. Above that, it calculates that 17% of the spills will be 30,000 gallons. Now, there is nothing in the record in terms of evaluating what that means to the environment. Whether that presents a large risk to the Colorado River that runs right next to the rail. But if you look back at J.A. 1198, when the board is talking about other spills that have occurred, it labels the spill that occurred in 2014 in the James River in Virginia as significant, as large. Well, that spill was 30,000 gallons. The same spill the board is characterizing are insignificant or present a low risk. That is just to lack factual evidence supporting any conclusions about risks of spills and impacts to water resources down the line, particularly the Colorado River. Thank you. Any other questions? Thank you very much. Your Honor, so I wanted to quickly address the point about where did they weigh greenhouse gas emissions from oil and gas consumption in the decision. If you go to JA45, this is where the board purportedly weighed all of the environmental harms against the transportation benefits. And what that says is, what that paragraph refers to is exclusively the indirect effect or the incremental impact of the railway, but not oil and gas    production harms. That paragraph says the  recognizes that with most other rail construction projects, the construction and operation of this line is likely to produce unavoidable environmental impacts. But the board also finds that the construction and operation of the preferred line is likely to produce unavoidable  So   JA45, this is where the board purportedly   environmental harms against   benefits.  that paragraph says is that the board     the reason why it was so important for the agency to address landslide hazards before approving the project and to have a complete analysis of landslide areas in the project area is because that also led to the board's decision to actually weigh environmental harms and to their finding that this project could carry out the rail transportation policy to operate rail transportation facilities without detriment to the public health and  And how could they have made the finding that this project carried out that policy without taking a look at a very significant environmental issue, whether the geological stability of the project is safe enough to support the oil trains, thousands of oil trains per year going through this area. And if I may just make one more point about our endangered species act claim going to look at the question about how does the May effect standard come into play here. Yes, the May effect standard is the trigger for formal consultation. But if there are multiple types of effects that could result on a listed species, the agency can't take and choose which ones they look at once they initiate consultation, formal consultation. Yes, water depletions they found may affect the species and so they focused on those, but there were these other effects from spills and leaks that they completely ignored. And because those also may affect the fish, they had to at the very least explain why they didn't need to address them. Because that met the low bar for formal consultation. So at the very least they had to explain why they didn't need to address it. And that's the proposition in the Center for Biological Diversity case from the 9th Circuit that we cite in our briefing. Thank you so much. Thank you very much. Thanks to all counsels for, I know it was a long argument, but it was helpful to hear from all of you and there's a lot of material to cover, so we're grateful. Thank you. The case is submitted. Thank you.
judges: Millett, Pillard, Wilkins